1   WO

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Raymond S. Salinas,                      No. CV-15-00009-TUC-EJM

10                    Plaintiff,              **ORDER**

11  v.

12  Carolyn W. Colvin,

13                    Defendant.

14

15

16          Plaintiff Raymond S. Salinas ("Salinas") brought this action pursuant to 42 U.S.C.

17  § 405(g) seeking judicial review of a final decision by the Commissioner of Social

18  Security ("Commissioner"). Salinas raises two general issues on appeal: 1) whether the

19  Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") assessment is

20  supported by substantial evidence, and 2) whether the ALJ's Step Five finding that

21  Salinas can perform work existing in the national economy is inconsistent with the

22  evidence and the law. (Doc. 23 at 1–2). Salinas specifically contends that the ALJ erred

23  in evaluating and weighing three of the medical expert opinions and that the ALJ failed to

24  provide clear and convincing reasons for finding Salinas not credible. *Id*. at 2.

25          Before the Court are Salinas' Opening Brief and Defendant's Response. (Docs. 23

26  & 25). Salinas did not file a Reply. The United States Magistrate Judge has received the

27  written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c)

28  and Rule 73, Federal Rules of Civil Procedure. The Court finds that the ALJ erred in

assessing Salinas's activities of daily living and that she gave improper consideration to Salinas's lack of treatment. These errors impacted the ALJ's RFC assessment and the hypotheticals posed to the VE. Consequently, these errors were not harmless because they ultimately impacted the Step Five nondisability finding, and the Court finds remand for further proceedings is appropriate.

## I.   Procedural History

Salinas filed an application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") on February 21, 2012. (Administrative Record ("AR") 159). Salinas alleged disability beginning March 20, 2011 (AR 159) based on an injury to his back and spine in a fall at work (AR 179). Salinas's application was denied upon initial review (AR 60, 88) and on reconsideration (AR 70, 93). A hearing was held on June 6, 2013 (AR 31), after which ALJ Lauren R. Mathon found, at Step Five, that Salinas was not disabled because he was able to perform other work existing in the national economy (AR 25). On November 6, 2014 the Appeals Council denied Salinas's request to review the ALJ's decision. (AR 1).

## II.   Factual History

Salinas was born on January 15, 1959, making him 52 at the alleged onset date of his disability. (AR 159). Salinas has a high school education and completed one year of college. (AR 179). Salinas's last job was with Olive Garden, from February through March 2011, where he worked as a prep cook. (AR 192). From 1997 to 2009, he worked as a lab technician for Baxter Health Care. *Id.* Salinas indicated that he lifted up to 50 to 70 pounds at Olive Garden and walked and stood for 9–10 hours of his work day. (AR 193). At Baxter Health Care, Salinas lifted up to 100 pounds or more and walked, stood, sat, and climbed for 10 hours a day. (AR 194).

### A.  Treating Physicians

Salinas had a CT of the lumbar spine on March 30, 2011. (AR 402). The findings were normal paraspinal area, normal bones, and "disc space narrowing, vacuum disc phenomenon, and small partially calcified right-sided herniated nucleus pulposus at L5–

S1, mildly posteriorly displacing the right S1 nerve root."

Salinas was seen by Dr. Colin Bamford on June 22, 2011 with a complaint of neck and back pain. (AR 447). He reported that his back pops up and locks, and that he was not improving and some things were worsening. Salinas stated that staying in one position and washing dishes aggravated his pain, and changing activities relieved it. He reported that his medications made him nauseated and woozy and affected his sleep, so he stopped taking them. On examination Dr. Bamford noted Salinas had marked limitation of mobility in his neck and low back. (AR 448). Dr. Bamford also noted that Salinas got onto the examination table slowly using a step stool, and that he asked to be able to stand at one point during the interview and stood for one minute. Dr. Bamford found normal strength and tone in all four extremities, normal sensation in all four extremities, ability to toe walk, normal gait, and trouble heel walking requiring balance support from the doctor. (AR 449). Dr. Bamford's impression was neck and back pain, and he noted that Salinas' "limitation of mobility is extreme and suspect." He also noted that Salinas had a small herniated disc "which is small enough that it could be asymptomatic" and that it was "partially calcified and consequently is probably old." Dr. Bamford recommended a MRI and EMG/NCV study.

Salinas had a MRI on July 21, 2011. (AR 405). The impression was:

> 1. L5–S1: Mild endplate degenerative changes, small Schmori's node inferior endplate L5 with minimal retrolisthesis, disc desiccation and disc bulge extending posterior 3–4 mm asymmetric to the right result in mass effect at the ventral subarachnoid space, moderate right and mild-moderate left neural foraminal narrowing.

> 2. L4–5: Disc desiccation and mild intraforaminal disc bulge results in mild bilateral neural foraminal narrowing.

> 3. L3–4: Disc desiccation present. Left asymmetric disc bulge results in mild left neural foraminal narrowing.

Salinas also had an EMG and NCV study of the lower extremities and paraspinals on July 21, 2011. (AR 407). Both tests were normal, and the impression was "no electrodiagnostic abnormalities in bilateral lower extremities." (AR 408).

Dr. Bamford saw Salinas for a follow-up appointment on October 12, 2011. (AR 444). Salinas reported he was doing the same, that nothing was working, and that he felt he was deteriorating. He complained of severe groin, knee, and back pain, and noted that activity worsened his pain and muscle relaxants relieved it. He also complained of walking awkwardly, numbness and burning spine pain, and weakness in his arms and knees. Salinas also reported he was depressed due to weight gain. He rated his pain as a 9/10. (AR 445). On examination Dr. Bamford noted Salinas had normal attention, concentration, mood, affect, speech and language. Dr. Bamford found normal strength in the upper extremities and left leg, but noted Salinas "provided a variable effort on strength testing of the right leg." Pinprick sensation was normal in all four extremities, but light touch was absent in the right leg. Dr. Bamford observed that Salinas got up from his chair slowly and walked to the examination table slowly, laid back on the table with ease, and sat up from the exam table slowly using his arms. Dr. Bamford's impression was possible neck and back pain, small herniated disc that is probably old, and symptom magnification. He recommended a physical medicine and rehabilitation consult, and that Salinas enroll in a work hardening program. (AR 446).

Salinas saw Dr. Bamford for a follow-up on October 26, 2011 with a complaint of back, groin, and leg pain. (AR 441). He reported that the severity of his pain was unchanged, that activity made it worse, and that Diclofenac relieved it. Salinas rated his pain as a 8/10. (AR 442). Dr. Bamford observed that Salinas had an unmotivated, slightly blunted affect, and normal attention and concentration. On exam, Dr. Bamford found: slightly decreased right grip strength with variable effort, variable effort of the right leg, normal strength in left arm and leg, normal tone in all four extremities, vibration sensation decreased at right ankle, pinprick and light touch absent in the right foot, and position sense decreased in both feet. Dr. Bamford observed that Salinas walked upright but slowly, and was able to get onto the exam table and remove his socks and shoes without difficulty. Dr. Bamford's impression was possible neck and back pain, small herniated disc that is probably old, and symptom magnification. He noted Liberty Mutual

had approved 6 work hardening visits for Salinas.

Dr. Bamford saw Salinas for a follow-up on December 7, 2011. (AR 438). Salinas complained of burning and numbness up and down his spine and low back spasms. He reported that his symptoms were different every day, that sometimes the pain was in his low back, upper back, and neck, and that he felt a pull in his upper back, spasms and locking in his low back, and that his neck felt misaligned with his spine. Salinas rated the pain in his upper back at a 6–7/10 and a 6–8/10 in his low back. Activity, using his arms, and walking all aggravate his pain, and inactivity, medications, and popping his neck in alignment relieve his pain. Dr. Bamford observed that Salinas got onto the examination table and laid down with ease, and got up without being asked to and without asking for help. (AR 439). On examination of the back, Dr. Bamford noted: palpation of the low back revealed no spasm; Salinas could touch his ankles but had minimal movement of the low back in all other directions; when asked to rotate his low back, Salinas "instead rotated his neck with reasonable excursion;" and Salinas "exhibited no expression of pain and made no statement of pain when asked to move his low back." On examination of the neck, Dr. Bamford noted that Salinas "had a fair range of motion in all directions." *Id*. Dr. Bamford also observed "poor effort on extension of the right knee and plantar flexion of the right ankle," and noted normal strength of the left leg and both arms, and normal tone in all four extremities. His impression was possible neck and back pain, small herniated disc that is probably old, symptom magnification, and somatization disorder. Dr. Bamford opined that Salinas "may return to work with the recommended work restrictions suggested by Karen Lumda which I feel are cautious and generous." *Id*.

On February 15, 2012 Dr. Bamford saw Salinas for a follow-up for back pain with numbness and tingling, and a new complaint of heel pain. (AR 435). Salinas reported that PT was not helping, that he tried to do his home exercises but they made his symptoms worse, and that Diclofenac temporarily relieved his pain. Salinas stated that he was doing worse and severe pain could hit him at any time, and that his pain is constantly a 5/10 but that he gets attacks twice per month lasting for a few minutes where it is a 10/10. Salinas

felt the heel pain was related to putting all of his weight on his heels to protect his back. Dr. Bamford observed that Salinas got up from his chair by holding onto the side bars, and that he walked with his back stiff. (AR 436). On the back exam, Dr. Bamford noted that Salinas could touch his toes, did not attempt to extend his back because he was worried it would increase his pain, could twist ok, side bends were mildly restricted due to pain, and there was tenderness of the right paraspinal muscles. On the neck exam, Dr. Bamford noted neck flexion, extension, and rotation were ok, and tilt was moderately restricted bilaterally due to pain between the shoulder blades. Dr. Bamford's impression was neck and back pain after a fall at work, new onset of heel pain, and moderate right and mild-moderate left L5 neural formamina narrowing. (AR 437). He recommended a lumbar Velcro corset, referral to a pain clinic for a facet block, and a follow-up appointment after Dr. Ennabi's evaluation, and renewed the Diclofenac prescription.

On December 12, 2012 Salinas was seen by Dr. Michael Milazzo for a complaint of back pain, muscle spasms, and a burning sensation in the left L5–S1 area. (AR 542). Salinas reported he could not bend over or walk 50 yards, and that he was taking Diclofenac for pain. He also reported extremity weakness, gait disturbance, numbness in his extremities, and muscle weakness. (AR 543). On examination Dr. Milazzo documented "[m]oderate paravertebral muscle spasm noted [from] cervical region to lumbar area" and "[t]enderpoint left L5–S1 to palpation." (AR 544). He also documented weakness on left foot dorsiflexion and diminished bilateral achilles deep tendon reflexes, and noted Salinas would not heel walk. Dr. Milazzo assessed herniated nucleus pulposus, L5–S1, left; muscle spasm of back; and obesity. He recommended a neurology reevaluation by Dr. Banford and prescribed Flexeril and Gabapentin. (AR 544–45).

Dr. Milazzo saw Salinas on January 10, 2013 for lab results. (AR 556). Salinas reported that there was no change in his back condition and that he had not seen the neurology specialist in Tucson. Dr. Milazzo assessed hypertension, hyperlipidemia, and herniated nucleus pulposus, L5–S1, left. (AR 557). He noted Salinas never filled the Neurontin prescription because he could not afford it, and gave Salinas a refill

prescription for the Flexeril.

Salinas saw Dr. Milazzo on February 20, 2013 for prescription refills. (AR 559). Salinas stated he had been summoned for jury duty but that he did not think he could not do it because he could not sit for an extended period of time. Dr. Milazzo noted Salinas complained of persistent muscle spasms in his back and pain, and on examination Dr. Milazzo indicated "[m]oderate paravertebral muscle spasm still noted" and "[t]enderness left L5–S1." (AR 560–61). Dr. Milazzo also documented "[w]eakness still noted left foot dorsiflexion" and "[d]iminished achilles still noted." (AR 561). Dr. Milazzo assessed hypertension and sciatica due to displacement of lumbar disc, and renewed Salinas' prescription for Flexeril. (AR 562). He also noted that bed rest was not a recommended treatment for back pain and that Salinas should stay as active as possible and do exercises to strengthen his back and abdominal muscles.

On April 3, 2013 Salinas saw Dr. Milazzo for prescription refills. (AR 563). Salinas reported he had been out of medication for 5 days and that he wanted to try the Gabapentin if he could afford it. Dr. Milazzo noted Salinas still had back pain and pain radiating down his left leg, and observed that Salinas "ambulates slowly because of back problems. (AR 564–65)." Dr. Milazzo documented normal deep tendon reflexes except for the left patellar, and weakness on the left foot dorsiflexion. He assessed hyperlipidemia, hypertension, and sciatica due to displacement of lumbar disc, and gave Salinas a prescription for Gabapentin. (AR 565–66). Dr. Milazzo also noted that Salinas could not afford to go see Dr. Bamford, and that he had disability and workman's compensation hearings coming up. (AR 566).

Salinas was seen on April 23, 2013 for a medication refill. (AR 568). Dr. Milazzo assessed sciatica due to displacement of lumbar disc, and noted that Salinas had not filled the Gabapentin prescription because he could not afford it. Dr. Milazzo also noted that Salinas refused to go to physical therapy. Dr. Milazzo prescribed Cymbalta.

### B.  Physical Therapy

Salinas was seen at Sierra Vista Regional Health Center Rehabilitation Services

for a physical therapy evaluation on January 16, 2012. Salinas reported that his current pain was a 7/10, that his pain at rest was a 7/10, and that his pain with activity was a 9/10. (AR 430). He noted that his symptoms were constant and come and go, and that they were worsening and not changing. Salinas stated that the following made his symptoms worse: walking/activity, sleeping, sitting, standing, lying down, turning/twisting, reaching, bending, gripping/grasping, stress, and work duties. He reported he was unable to engage in any activities and that after about 5 minutes of doing an activity his pain would increase and his back would lock up. (AR 474). The PT noted that Salinas currently had severe pain with activities of daily living, with a therapy goal of reducing that to moderate pain, and that Salinas was unable to perform specific work activity secondary to pain or limitation, with a therapy goal of reducing pain during or after work activity to a moderate level. (AR 475). Physical findings included: bilateral lumbar back pain, mild increased lordosis of the lumbar spine with stance, normal movement, and tenderness with palpation of the soft tissues throughout the mid and lower spine. (AR 475). On the spinal assessment, the PT noted that Salinas was "able to grab both knees, [but] does not tolerate continued flexion of the spine" and "[h]e is very limited with side bending due to reported 'locking' of the trunk with very little pain." (AR 476). Salinas was negative for all spine tests except one straight leg raise test, indicating hamstring tightness. The PT also noted that Salinas reported pain "to radiate into the right lower extremity but there is currently no signs or symptoms of progressive radiculopathy." The PT observed that Salinas presented with impairments of: "1 weakness of the trunk and extremities, 2 decreased tolerance to sitting, standing, walking, reaching [and] 3 decreased trunk movement due to pain and reported 'locking'" and recommended 8 weeks of PT. (AR 476–77).

A progress note from January 19, 2012 notes that Salinas reported pain between his shoulder blades when doing chin tucks during his home exercise program. (AR 482). He agreed to continue to try to do the exercise with modifications for pain. The PT noted that exercised were modified to accommodate Salinas' pain, and that Salinas reported

increased pain between his shoulders with activity.

A progress note from January 24, 2012 notes that Salinas stated his pain was getting worse and that his home exercise program was too painful. (AR 483). The PT commented that "Raymond has increased difficulty with today's exercise session, he has pain with all activities and quits halfway through exercises stating they are too painful to continue."

A progress note from January 26, 2012 notes that Salinas reported he was doing better than at his last PT session and was performing his home exercise program to tolerance. (AR 484). The PT commented that Salinas demonstrated "improved activity tolerance" but "require[s] frequent rest breaks due to pain," and "once he rests his pain levels decrease."

A progress note from January 31, 2012 notes that Salinas reported he was doing his home exercise program and had increased pain with prone extension exercises, and that he was still having significant pain. (AR 486).

A progress note from February 20, 2012 states that "Raymond demonstrates improved activity tolerance today's visit, he has no reports of pain throughout session." (AR 487).

A progress note from February 23, 2012 states that Salinas reported "no changes in his back symptoms since the start of therapy" and that "he reports completing his home program with no results." (AR 488). Salinas also reported "he felt good prior to last session, has since been in significant pain through the back, continuing to have 6/10 pain." He further reported "getting occasional sharp pain in the back that has a stabbing pain in the past month," that he continued to have an occasional locking sensation in his back, and that his pain is relieved with ice only. A reevaluation completed on February 23, 2012 notes that Salinas was making steady progress towards his treatment goals. (AR 490). However, Salinas had not yet met his short term goals of improving strength and range of motion or being independent with his home exercise program, nor had he met the following long term goals: stand and walk for 30 minutes with a pain level of 5/10,

reach forward and place a 5 pound object in a cabinet with pain at a 4/10, stand and was dishes for 15 minutes with pain at a 4/10, and sleep for 4 hours without interruption. (AR 490–91). The PT noted that Salinas was going to see another specialist and would then contact the PT if he wanted to continue therapy, but that "[o]therwise there has not been consistent improvement to warrant continued treatment at this time." (AR 492).

A discharge summary dated April 19, 2012 notes that Salinas was seen for 8 visits for back pain, and that Salinas was to call after his last doctor's appointment if further PT was needed. (AR 495). Salinas did not call and was administratively discharged from PT because: "1. Evaluation complete and plan of care established however, the patient did not return/complete therapy program 2. The patient did not comply with plan of care attendance policy failing to show or cancelling three or more consecutive appointments."

### C. State-Agency Consulting Physicians

Salinas was seen by Dr. Jeri B. Hassman, a certified independent medical examiner, for a physical medicine consultative examination ("CE") and statement of ability to do work-related activities on November 10, 2012. (AR 525). Salinas reported that he was injured on the job on March 20, 2011 and "[s]ince then, he has had constant, severe midback pain and low back pain plus pain down both legs." He also reported "worse pain in the legs, including the ankles and knees, with prolonged standing." Salinas stated "he was feeling better when he was getting some therapy and was on pain medication, but his Workmen's Compensation was closed in February 2012, and since then he has not had any treatment." Further, Salinas "was supposed to get facet joint injections and a lumbosacral corset, but he never obtained either of those."

On examination, Dr. Hassman observed the following:

> His gait was very abnormal. He took very tiny steps and he was very stiff. . . . He hardly moved his head at all when he walked. He could not stand or walk on his toes because, he said, it caused too much back pain. The same was true for heel walking. He also refused to hop for the same reason. He performed tandem walking very carefully, holding on for balance. He could not perform bending at all. . . . He seemed to have an unusual response to anything I asked him to do. He sort of smiled to himself and looked around, as if he were confused and distracted, and just could not perform anything.

> He also could not perform kneeling. Taking off his shirt took a lot of time. . . . At least three times he started to sit down, but he never really sat down during the physical examination, even when I asked him to sit down, because, he said, sitting was more painful than standing. . . .
>
> I asked him to perform cervical flexion. He obviously heard me but he did not move his head. Instead, he moved his eyes in all directions . . .
>
> He had no tenderness over the cervical spine. However, he had moderate tenderness over the thoracic and lumbar spine. . . .
>
> He could not perform any trunk flexion. The most he could bend was 10 degrees. He had no trunk extension. He could not sit or get on the table for straight leg raising test.
>
> He had normal sensation of both lower extremities. . . .
>
> I could not formally test hip flexion or knee extension, since he would not sit down because of too much pain.
>
> He had full range of motion of both upper extremities without pain.

(AR 527). Dr. Hassman's diagnosis was:

> Severe back injury since a twisting injury to the spine on March 20, 2011. . . . He has a very antalgic, abnormal gait with tiny steps and keeps his trunk very stiff, and he has essentially no ability to perform any bending or kneeling and cannot perform any cervical range of motion either because of the pain.

(AR 528). Dr. Hassman then completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) ("MSS"). She opined that Salinas' condition would impose limitations for 12 continuous months, that he could occasionally[1] and frequently[2] lift and carry less than 10 pounds, stand and walk at least 2 hours but less than 6 hours in an 8 hour workday, and sit for 3 hours. (AR 528–29). She opined that Salinas had no restrictions in seeing, hearing, speaking, handling, fingering, or feeling, that he could occasionally stoop and reach, and that he could never kneel, crouch, crawl, or climb

---

[1] The form defined "occasionally" as up to 1/3, or no more than 2 hours of an 8 hour workday.

[2] "Frequently" was defined as 1/3 to 2/3 of an 8 hour workday.

- 11 -

ramps, stairs, scaffolds, or ladders. (AR 530). Dr. Hassman also stated Salinas could not work around heights, moving machinery, or extremes in temperature.

Salinas was seen by Dr. Sloan King for a psychiatric CE on November 12, 2012. (AR 533). Salinas reported an unsteady gait, and requested assistance from the hotel staff and Dr. King when walking back to his car. Salinas "stood throughout his entire hour long appointment, stating that his back felt as though he were 'being poked with nails,' and he chose to save his stamina so he that he could sit in his car to drive" home. Dr. King noted that Salinas was not clean shaven, and Salinas explained that his fiancé was out of town and unable to assist him, and that he had difficulty lifting his arms and holding his hand steady to shave due to his pain. Salinas reported "significant pain as a result of his injury, which begins as a central pain down the middle of his back, moves to the left side of his waist, and feels as though many of his nerves are in a bundle and 'twisting.'" (AR 534). He also stated the pain causes swelling in his ankles and knees, especially after sitting or standing for any period of time. Salinas reported his pain was constant and that he typically lies on the couch most of the day. "He sleeps on the couch as well, 'rolling off' in the morning in order to wake up as the bed is too high and he cannot comfortably get in or out." Dr. King noted Salinas had no history of mental health issues, but that "he reports symptoms of depression and anxiety as a result of the onset of his disabling condition." (AR 535).

Dr. King made the following notes regarding Salinas' current level of daily functioning:

> Mr. Salinas is up by 4 or 5 in the morning. He tries to monitor his movements as to prevent spasms or acute flares . . . He is able to cook things in the microwave if his fiancé is not at home, but otherwise relies on her to do all of the cooking, yard work, chores, laundry, and driving. He has attempted to do things like wash dishes, but cannot stand longer than five minutes. . . . Mr. Salinas is inactive and expressed his frustration with a 30 to 40 pound weight gain since the time of his accident. Prior to his injury, he was able to play basketball, play physically with his dogs, do the dishes, and yard work. . . . Mr. Salinas demonstrates overall ability to independently maintain a household. He demonstrates compromised but minimally sufficient levels of concentration, persistence, and pace necessary to complete

domestic chores and engage in leisure pursuits.

(AR 535–36). Dr. King noted that Salinas "presented with good interpersonal skills, although he appeared to be in significant pain, and was anxious for the appointment to be completed." (AR 536). Dr. King observed the following regarding Salinas' mental status:

> Mr. Salinas presented with a painful expression, but was able to smile appropriate to context, although his range of affect was fairly restricted overall. [He] reports a depressed mood, and had daily, passive thoughts of suicidal ideation in which he wishes to avoid the pain, even if it means ending his life. . . . He has noticed increased irritability, which he describes as 'snappiness' and anger at others, based on his inability to work but desire to do so. His worries are fairly typical in nature, such as concern about finances and credit cards after his loss of income. . . . He reports low levels of energy, feeling drained and fatigued since the time of his accident. He had no problems with concentration in the past, but now has difficulty focusing. . . . Mr. Salinas has some problems with sleep since the accident, in that he is awake because of the pain and sleeps five hours on average. . . . Mr. Salinas demonstrated no significant problems with cognitive functioning . . . and appeared to be functioning in at least the average range of intelligence . . . Although he reports difficulty with concentration, his ability to focus appeared fairly intact as evidenced by a subtracting backwards on the serial sevens task. He demonstrated poor judgment in response to a scenario presented to him, and also appears to have a concrete thinking style.

(AR 536–37). Dr. King's diagnosis was: adjustment disorder with depressed mood (chronic), pain disorder associated with lower back injury/pain (chronic), occupational problems (unemployed since time of injury), economic problems (currently unable to pay many of his bills), inadequate access to healthcare services (uninsured since February 2012, and unable to afford prescription medications or health care appointments). (AR 537). Dr. King assessed a current GAF[3] score of 55, and a GAF score of 50 for the past year.

Dr. King also completed a Psychological/Psychiatric MSS, and indicated that Salinas had a psychological diagnosis with limitations expecting to last 12 continuous months. (AR 538). Dr. King stated that "Mr. Salinas demonstrates the ability to

---

[3] Global assessment of functioning

understand and remember detailed instructions." Regarding sustained concentration and persistence, Dr. King noted that

> Mr. Salinas presents with moderate to marked limitations based on his reported level of chronic and persistent pain. Based on his reported presentation, he would have difficulty performing tasks within a normal work day due to significant interruptions and frequent rest periods. However, Mr. Salinas reports contradictory information from an independent medical examiner that apparently alleged the claimant was able to return to employment in February 2012.

*Id.* Dr. King also opined that Salinas "should have no difficulty getting along with others within the realm of recent superficial contact" and that Salinas "demonstrates the ability to travel in unfamiliar places as well as utilize public transportation." (AR 539).

### D. Additional Medical Information

Salinas was seen by Karen Lunda, PT, for a functional capacity evaluation ("FCE") on November 28 and 29, 2011. Lunda noted that Salinas was "pleasant and cooperative and put forth good effort over the two days of testing" (AR 418), and that he "demonstrated a consistent reliable performance (AR 422). The findings on exam included:

> Decreased hip and trunk rotation along with decreased arm swing during ambulation (consistent with decreased spinal mobility)
>
> Decreased intervertebral mobility during active trunk ROM testing
>
> Decreased intervertebral mobility with PA glides in the lower thoracic and lumbar spine with reproduction of the client's reported pain
>
> Consistent palpation exam performed before and after both days of testing. The areas reported as symptomatic were marked with an ink pen. These areas were the same areas the client pointed to when reporting an increase in symptoms during functional testing.

(AR 418). Lunda noted that Salinas scored 68 on the Oswestry Low Back Pain Scale, which falls in the "crippled" category and is defined as "back pain impinges on all aspects of the patient's life." (AR 419). Salinas reported that he had been placed on

multiple medications for his pain, none of which had helped except for Diclofenac, and that while the Diclofenac helped somewhat, it did not affect the cause of his pain. (AR 422). Salinas also reported that any physical activity increases his symptoms, and that if he doesn't stop what he is doing, his back will tighten up and may go into spasm and then lock up. *Id*. Lunda noted that Salinas' "functional abilities and limitations were consistent with his diagnoses, his past medical history and objective physical examination findings" (AR 422), and that although he "was limited at times by a subjective report of an increase in symptoms," his symptoms were consistent with his physical exam and his report was credible (AR 423).

Regarding Salinas' ability to return to work, Lunda made the following recommendations:

> Lift from floor to waist 10 pounds rarely and 5 pounds occasionally
>
> Lift from waist to overhead 10 pounds rarely and 5 pounds occasionally
>
> Horizontal lift 25 pounds rarely and 15 pounds occasionally
>
> Two hand carry 25 pounds rarely and 15 pounds occasionally
>
> One hand carry 15 pounds rarely and 10 pounds occasionally
>
> Push 87 pounds of force rarely and 65 pounds occasionally
>
> Pull 88 pounds of force rarely and 66 pounds occasionally
>
> Lifting, carrying, pushing and pulling should be performed to tolerance with positional/activity changes allowed as needed
>
> Crouching could be performed on a rare basis
>
> Kneeling, walking, stair climbing and ladder climbing could be performed occasionally if performed to tolerance with positional changes allowed as needed
>
> Repetitive squatting, elevated work and forward bending in standing could be performed frequently, and should be performed to tolerance with positional changes allowed as needed.

(AR 424–25). Lunda recommended physical therapy to "address the decrease in vertebral mobility and the right hip adductor musculature." (AR 418).

- 15 -

Salinas was seen by Dr. Jon Ostrowski on February 15, 2012 for an independent medical examination for his worker's compensation claim. (AR 571). Salinas' chief complaint was low back pain with radiation of pain up into the neck. He reported that he did not think the PT sessions were helping, and that every day he had different types of pain in different areas, including his neck, mid back, and low back. (AR 572). Salinas stated that he felt like there was a lump in his back that moved around to the right or left side, that he had burning pain radiating to his neck, and that he had episodes of very sharp pain in his upper and lower back. His back pain increases with prolonged standing or when he tries to walk more than 100 yards. He also reported recent onset of a throbbing pain in his heels. Dr. Ostrowski noted Salinas had been prescribed muscle relaxers, anti-inflammatories, and prednisone, and was currently taking Diclofenac but did not feel it was very effective. Salinas stated his lowest pain level was a 5/10, his highest pain level was 10/10, and that his current pain was a 5/10. Salinas reported he had just obtained a lumbar corset but hadn't had a chance to use it yet, and also had a referral to be evaluated by a pain management specialist.

On physical examination, Dr. Ostrowski made the following observations:

> Gait is normal. He does not use an assistive device for ambulation. He is able to get on and off the examination table without difficulty or assistance. . . .

> Cervical spine range of motion is full and pain free. Cervical foraminal compression testing is negative bilaterally. Gentle axial compression does not produce any complaints of pain. Thoracic spine is nontender to percussion. Lumbar spine range of motion is full. He is able to get his fingertips within 6 inches of the floor when bending forward. . . .

> Range of motion of the bilateral shoulders is full and pain free. . . .

> There is moderate tightness of the bilateral hamstring musculature. . . . Range of motion of the bilateral hips, knees and ankles are full. . . . There is mild tenderness to palpation of the mid right abductor musculature.

> Manual muscle testing is grade 5/5 in the bilateral upper and lower extremities. . . . He reports pain with palpation diffusely in the mid and low lumbar paraspinal musculature. . . . There was no involuntary muscle spasm noted in the cervical, thoracic or lumbar musculature. . . .

> He is able to heel and toe walk without difficulty. Tandem gait is quite unsteady. Squat and return is full.

(AR 573–74). Dr. Ostrowski's impression was "[s]ubjective complaints of migratory and fluctuating levels of neck and back pain." (AR 574). He further stated that:

> Mr. Salinas' current subjective complaints are widespread and do not appear to have any specific relationship to the alleged industrial injury. There are no objective abnormal findings on physical examination which are consistent with a definable myofascial pain, orthopedic spinal problem or neurologic spine disorder. He does have the presence of an old calcified disk herniation at L5–S1 which does not correlate to any of his current symptomology nor does the disk herniation appear to be secondary to the industrial injury.

(AR 574). Dr. Ostrowski noted Salinas was receiving PT but no progress was reported, and stated that he would not recommend any further treatment with PT or pain medications. (AR 574–75). Dr. Ostrowski further opined that no additional treatment was indicated, and that Salinas could return to work full time at regular duty and did not need permanent or temporary work restrictions. (AR 575). Dr. Ostrowski also stated that Salinas was not disabled and did not meet the criteria for a permanent impairment rating because he "did not have a defined etiology for his pain complaints and there has been a great deal of fluctuation in the nature and location of these complaints over time." (AR 575–76).

On June 12, 2012 DDS physician Dr. Charles Fina made an initial determination that Salinas was not disabled. (AR 60). Dr. Fina completed a RFC assessment with the following limitations: occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk 6 hours, sit 6 hours, unlimited pushing and pulling, frequently kneel, balance, and climb ramps and stairs, and occasionally stoop, crawl, crouch, and climb ladders, ropes, and scaffolds. (AR 66). Disability examiner Ann Abyad noted that Salinas' RFC was for light work and opined that he could return to his past work as a quality control technician as that job is typically performed in the national economy. (AR 67–68).

On reconsideration, Salinas was again found not disabled on November 16, 2012.

- 17 -

(AR 70). Regarding Salinas' mental impairments, Dr. Andres Kerns found that Salinas had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (AR 79). Dr. Kerns made a mental RFC assessment and found Salinas was moderately limited in the following areas: ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and ability to respond appropriately to changes in the work setting. (AR 83–84). Dr. Kerns opined that Salinas was "able to maintain adequate attention and concentration for simple routines and to sustain a workday/workweek schedule" (AR 83) and that Salinas could "adapt to simple changes, avoid obvious hazards, and travel" (AR 84). Dr. Kerns also stated that Salinas could:

> meet the basic mental and emotional demands of competitive, renumerative, unskilled work including the abilities (on a sustained basis) to:
>
> A) Understand, carry out, and remember simple instructions.
>
> B) Make simple work-related decisions.
>
> C) Respond appropriately to supervision, co-workers, and work situations.
>
> D) Deal with routine changes in a work setting.

(AR 84).

Regarding Salinas' physical impairments, Dr. Woodard found that Salinas was only partially credible because his allegations of total and permanent disability exceeded the limitations that would reasonably be expected based on the totality of the evidence. (AR 80). Dr. Woodard made the same RFC assessment as Dr. Fina. (AR 81–82). Dr. Woodard noted that Dr. Hassman's opinion was more restrictive but that that opinion

relied heavily on Salinas' subjective report of symptoms and limitations that were not supported by the evidence, and that Dr. Hassman's opinion had inconsistencies. (AR 84). Dr. Woodard also stated that Dr. Hassman's "opinion is an overstatement of the severity of the individual's restrictions/limitations based only on a snapshot of the individual's functioning," whereas Dr. Woodard's RFC finding was based on the totality of the evidence. (AR 85).

The reconsideration report also found that Salinas could not perform his past relevant work as a prep cook because that work exceeded his RFC for light work, and could not perform his past relevant work as a quality control technician because of his mental RFC. (AR 85). However, the report noted that Salinas retained the capacity to perform other light, unskilled work, and thus was not disabled. (AR 86).

### E.  Plaintiff's Testimony

On a Disability Report dated February 22, 2012 Salinas reported that he injured his back and spine in a fall at work, that his condition caused him pain, and that he had stopped working because of his condition. (AR 179).

On an Exertional Daily Activities Questionnaire dated May 16, 2012 Salinas reported that he "can't do much like stand, walk," that he had sleepless nights, and that his girlfriend helped out a lot. (AR 189). He reported dizziness and drowsiness were side effects of his medication. Salinas stated he could walk 20 yards and then had to stop because his ankles would swell up, his back would hurt, and his back and waist would want to lock up. He stated he could not lift and carry, did not do the grocery shopping, did not clean, cook, do laundry, yardwork, or other chores, drove very little, and had no activities. (AR 190). Salinas reported that he sleeps for 3 hours off and on, and that he also naps for several hours a day. He uses a cane to help walk. (AR 191). He described a burning sensation up and down his waist and reported his lower back was in constant pain, and that his feet swell up. (AR 191).

On a Disability Report—Appeal dated July 6, 2012 Salinas reported his condition had gotten worse as of March 1, 2012, and that he had swelling of the joints, ankles, and

knees, was unable to walk, stand, or sit for any long period of time without being in severe pain, had trouble sleeping, and had trouble performing his everyday functions. (AR 200). Salinas also reported that he needed a cane to walk, and that he was physically and mentally stressed and exhausted due to pain and lack of sleep. He noted that he could not work so he was unable to obtain medical insurance, and that his pain was getting worse but he could not obtain medical treatment or pain medication. (AR 201). Salinas stated his girlfriend "needs to care for me with driving walking and keeping up our home" and that he "struggle[s] with driving and doing any household up keep." (AR 203). Salinas also stated that "[t]he lack of sleep due to pain and financial distress have put me in a depression. I can not [*sic*] think clearly." *Id.*

On a Function Report dated October 25, 2012 Salinas reported he was in severe pain and had no insurance to go to the doctor. (AR 208). He described his typical day as eating meals, watching TV, getting ready for bed, and not doing any heavy lifting. (AR 209). Salinas stated he did not take care of any other people or animals, and that before his illness he could work 50 hours a week, take care of animals, and play sports. He reported that his pain was unbearable and his medications made him nauseous and restless and caused weight gain. Regarding his personal care, Salinas stated he could not tie his shoes, put on clothes, or button, had less desire to bathe because he was not very stable, washing his hair was difficult, and shaving, feeding himself, and using the toilet were ok. (AR 210). He reported that he never prepared his own meals (AR 210), did no chores or yardwork, went out four times a week with his fiancé or brother-in-law, drove very little ("only if necessary"), and did no shopping (AR 211). Salinas stated his fiancé handles all the finances and that he had no desire and a lack of concentration to handle money since his illness. (AR 212). The "only thing he can do is watch tv," which he does every day, but Salinas noted watching TV used to be enjoyable and "now it is to [*sic*] painful and depressing." Salinas reported he was "homebound" and that needed someone to accompany him places, and that he had no social activities. (AR 212–13). Salinas indicated that his illness affects his ability to: lift, squat, bend, stand, reach, walk, sit,

kneel, climb stairs, remember, complete tasks, concentrate, and use his hands. (AR 213). He stated he had very limited mobility due to chronic severe pain all over, could walk 20 yards and then needed to rest, and indicated the amount of time he could pay attention varied. Salinas also stated he did not finish what he started, and had limited concentration but could follow written and spoken instructions ok.

On a Disability Report—Appeal dated December 11, 2012, Salinas stated that his illness was worse since last completing a disability report and that he had more limitations and fewer activities. (AR 223, 226). Salinas stated that he was having more trouble using his arms and hands, and had numbness and pain in his feet. He reported that he needed help with bathing and dressing and that he needed to sit down to put on his shoes and only wore slip on shoes. (AR 226).

Salinas testified at his hearing before the ALJ on June 6, 2013. Salinas stated that he lived with his fiancé, brother-in-law, and four dogs, and that he did not do anything to care for the dogs. (AR 36). He testified that he was injured on the job on March 20, 2011, that worker's compensation sent him for an independent medical exam and the doctor told him to go back to work the next day, and that he did not return to work because he was unable to work. (AR 38). He tried to take action to appeal the closing of his worker's compensation case but was not able to obtain counsel in time for the hearing. (AR 38–39). Salinas stated that since he stopped working, he supports himself financially by borrowing money from his mom, sister, and fiancé, and receives food stamps. (AR 39). He also received worker's compensation money until his case was closed and lived on that for one year. (AR 42).

Salinas testified that that he was currently seeing Dr. Milazzo for treatment of his pain, and was not receiving PT. (AR 41). When questioned by the ALJ as to whether there was some explanation as to why Dr. Hassman's "findings were sort of dramatic in nature about the problems you were having," Salinas stated that at that time he had run out of medication and was not seeing a doctor, so it was a tough time for him. (AR 42–43). The ALJ questioned whether Salinas was "actually better than what that report

would suggest? That was just a particular bad day for you?" and Salinas said "yeah" and agreed that his medications helped. (AR 43).

Salinas testified that he had pain every day and stated "It's 24/7, right now." (AR 43). He described his pain as "centralized on the back of my lower back, waist, on the left side," a burning sensation up and down his spine, and if he walks a certain distance there is burning pain down the back of his legs to the bottom of his feet and it feels like he is walking on nails. (AR 47). His feet and ankles also swell. Without medication, he rated his pain at a 7 or 8/10, and a 10/10 when he had a spasm attack. (AR 43). With medication, Salinas said his pain was a 6 and was "constantly burning." There are no days when he is not in pain. (AR 44). He can stay on his right side but has problems sleeping, and has to be careful with his movements because "[m]ovements is what causes my pain." Salinas stated that he does not move at all if possible, and that if he raises his arms up for 5 to 10 minutes to read a newspaper, his back goes into spasm and severe pain. All day he tries to prevent his back from going into spasm, so he avoids movement and spends his time in a recliner or lying on his side in bed. (AR 47). Salinas testified that he was currently taking Ibuprofen 400 for pain (AR 43), and while the transcript is somewhat unclear, it seems that Salinas was also taking a second pain medication (AR 44).

Regarding his emotional health, Salinas stated that he was definitely suffering from depression because his life had completely changed since the day of his accident. (AR 48). He was not getting any treatment or taking medication for his depression, and stated that "there's other medications Milazzo has prescribed for me but due to the fact I have no income, or any type of insurance, I can't afford those medications."

Salinas testified that he could stand longer than sit (AR 44), and that he can stand still for about a half hour and sit for about 15 minutes (AR 45). When questioned how he got to the hearing and whether he could sit for the whole drive, Salinas testified that his brother-in-law was his driver and that the car had reclining seats so that Salinas could recline back and relieve the stress on his back. (AR 45–46). When questioned about

chores, Salinas stated that he did not do laundry, cook, or go grocery shopping, and that "washing dishes because of the arm movements or anything like that, puts the back into spasms." (AR 46).

### F. Vocational Evidence

At the hearing before the ALJ, Lynda Berkley testified as a vocational expert. She stated that Salinas' past work with Baxter Health Care as a warehouse worker was classified as medium, and that his work as a quality control technician was classified as light work but Salinas performed it at the medium level. (AR 51). The ALJ noted she was not going to count Salinas' past work as a kitchen helper because it "was a pretty short job."

Based on the first hypothetical provided by the ALJ,[4] Berkley testified that Salinas could not perform his past relevant work as a quality control inspector as he actually performed it, but that he could perform the work as it is described in the DOT. (AR 53). Based on the second hypothetical provided by the ALJ, which included some moderate mental limitations,[5] Berkley testified that Salinas could not perform the job of quality control inspector. (AR 54). When the ALJ questioned what jobs the person could do, Berkley stated "I don't believe any, and primarily because of the -- if there's a moderate impairment in maintaining regular attention -- attendance, being punctual, working within a consistent pace, I think that's going to preclude all work." Based on the third hypothetical provided by the ALJ, which did not include limitations on concentration,

---

[4] This hypothetical included the following: lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for 6 hours, sit for 6 hours, occasionally climb ladders, ropes, scaffolds, stoop, crouch, and crawl, frequently climb ramps and stairs, balance, and kneel. (AR 53).

[5] The ALJ added to the first hypothetical the following: moderate limitations in ability to maintain concentration and attention for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace, and respond appropriately to changes in the work setting. (AR 53–54). The ALJ defined "moderate" as "more than a slight limitation in this area but the individual is still able to function satisfactorily." (AR 53).

attention, attendance or pace,[6] Berkley testified that Salinas could not perform his past relevant work but could do other light work, specifically the jobs of a housekeeper cleaner or a fast food worker. (AR 55).

When questioned by Salinas' attorney, Berkley stated that her understanding of simple work is that it is unskilled work (AR 56), and that someone with mild limitations could still sustain unskilled work (AR 57). Berkley further stated that someone with moderate to marked limitations in concentration, persistence, and pace would be precluded from all work. (AR 57).

### G. ALJ's Findings

The ALJ found that Salinas had the following severe impairments: back pain and depression. (AR 15). The ALJ noted that these impairments were more than slight abnormalities and had more than a minimal effect on Salinas' ability to do basic physical or mental work activities and were therefore severe. The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders.[7] The ALJ found Salinas had mild limitations in activities of daily living and maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had no episodes of decompensation of an extended duration. (AR 16).

The ALJ found Salinas' testimony regarding the intensity, persistence, and limiting effects of his symptoms was not fully credible based on his ability to participate in activities and because the medical evidence did not support the severity of the alleged

---

[6] The ALJ added to the first hypothetical the following: mild limitations in understanding and remembering simple instructions, carrying out simple instructions, and ability to make judgments on simple work related decisions. Moderate limitations in ability to understand, remember, and carry out complex instructions, ability to make judgments on complex work related decisions, and ability to respond appropriately to usual work situations and change in a routine work setting. (AR 55).

[7] The criteria are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) periods of decompensation. As to the first three of these, the court determines whether their severity is none, mild, moderate, marked, or extreme. As to the fourth criteria, it is the number of times these "periods of decompensation" occur. See 20 CFR 404.1520a(d)(1) and 20 CFR 404, Subpart P, App. 1, § 12.00

allegations. (AR 18–19). The ALJ noted that while Salinas stated he could not do much and his girlfriend helped out a lot, Salinas also said he could drive very little, and acknowledged his daily activities included eating, watching television, and getting ready for bed. (AR 18). The ALJ also noted that while Salinas said he did not do any heavy lifting, he provided no limitations for light lifting, which the ALJ found "inconsistent with his previous allegations of not being able to lift and/or carry." The ALJ further noted that while Salinas alleged he could not tie his shoes or put on clothes with buttons, "[o]therwise he acknowledged the ability to perform all other personal care activities with some difficulty bathing and caring for hair." The ALJ also pointed to Salinas' statements that he went outside four times a week, could go out alone, could drive very little only if necessary, spent time with his family, could walk 20 yards and then required varying minutes of rest, his ability to concentrate varied, and he could follow spoken instructions.

The ALJ also noted that Salinas testified that he was not receiving PT at the time of the hearing, that he admitted he felt better with pain medication, that he was not taking any pain or depression medication at the time of the CEs in November 2012 and that he was not as bad now as he was in November 2012 because he was now on pain medication, and that at the time of the hearing he was not taking mental health medications or receiving psychiatric treatment. (AR 18).

The ALJ also considered the medical evidence and found that it did not support Salinas' allegations because Salinas "was documented as receiving routine and conservative treatment for back pain, numbness, and spasms." (AR 19). The ALJ further noted that Salinas was prescribed medications, received PT and facet block, and stated his medications were helpful. The ALJ also found that Salinas' diagnostic images did not support the severity of his allegations, and that the EMG and nerve conduction velocity findings were normal. (AR 19–20). She summarized the abnormal MRI and CT findings but noted that "the remainder of the images were unremarkable." (AR 19).

The ALJ further found that Salinas failed to follow treatment recommendations, noting that Salinas was discharged from PT for failing to return/complete the program

and did not comply with the attendance policy by failing to show or cancelling three or more consecutive appointments. (AR 20). The ALJ also stated that Salinas was documented as refusing to go to PT in a treatment note dated April 24, 2013, and noted that while "it is not the primary basis for the decision in this case, the claimant's failure to follow prescribed treatment without a good reason is a basis for finding the claimant is not disabled."

Regarding Salinas' credibility as to his mental impairments, the ALJ found that while Salinas alleged he could not afford treatment, "[t]his is inconsistent with the fact that he did receive some treatment, including prescriptions for medication, after the alleged onset date." (AR 22). The ALJ also noted "there is no evidence the claimant sought low cost or no cost mental health care." The ALJ concluded that Salinas' "failure to seek consistent mental health treatment and take mental health medications as prescribed demonstrates a possible unwillingness to do what is necessary to improve his condition" and "may also be an indication that his symptoms were not as severe as he purported."

The ALJ gave little weight to the opinion of Karen Lunda because the limitations noted by Lunda were inconsistent with Salinas' statement that he drove 2 hours and 10 minutes to the exam, stopping once for gas, and because Salinas' examination was "generally unremarkable." (AR 20). The ALJ also gave little weight to Dr. Bamford's opinion, and noted that Dr. Bamford opined that Lunda's limitations were cautious and generous, but that Salinas could return to work with the limitations noted by Lunda. The ALJ further noted that Lunda was a PT and thus not an acceptable medical source opinion, and Dr. Bamford's opinion was related to Salinas returning to work. (AR 21).

The ALJ gave great weight to the state agency physical medical consultants, noting that the physicians opined that Salinas could perform a range of light work. (AR 21). The ALJ stated that she had assessed a similar RFC, taking into consideration Salinas' subjective complaints and the entire objective record.

The ALJ first stated that she gave great weight to the opinion of Dr. Ostrowski

(AR 21), but then stated that she gave his opinion some weight (AR 22). The ALJ noted that "Dr. Ostrowski stated there were no objective abnormal findings on physical examination that were consistent with a definable myofascial pain, orthopedic spinal problems, or neurologic spine disorder" and that Dr. Ostrowski opined that Salinas could return to work full-time with no temporary or permanent work restrictions. (AR 21). The ALJ noted that Dr. Ostrowski's opinion was provided in the context of a workers compensation claim, but stated that he "was an independent medical examiner and subsequently did not have the same type of bias associated with medical opinions on either side of the workers compensation claim." (AR 22).

The ALJ gave little weight to Dr. Hassman's opinion because her opinion "does not adequately take into consideration all of the claimant's subjective and objective symptoms, signs, limitations, and severity of condition" and because Dr. Hassman did not "have access to the claimant's entire medical record and testimony." (AR 22). The ALJ also noted that Salinas testified that he was not taking any pain medication at the time of his appointment with Dr. Hassman and that his condition was improved with medication.

The ALJ gave little weight to Dr. King's opinion that Salinas had moderate to marked limitations, and noted that the ALJ found Salinas had different mental limitations based on the entire evidence of record. (AR 22–23). The ALJ also noted that Dr. King did not have access to the entire medical record and testimony, and that Salinas testified that he was not receiving mental health treatment or taking medications. (AR 23).

The ALJ also gave little weight to the state agency psychological consultants who assessed some mild and moderate limitations on reconsideration. (AR 23). The ALJ noted that she had "provided for different attendance and punctuality limitations given the record" (AR 23), and that the state agency consultants "did not have the benefit of considering the additional evidence that was available only after the reconsideration determination including subsequent medical evidence and the hearing testimony" (AR 24).

The ALJ concluded Salinas could perform light work with the following

restrictions:

> lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing, and/or walking about six hours in an eight-hour workday; occasionally climbing ladders, ropes, or scaffolds; occasionally stooping, crouching, and/or crawling; frequently climbing ramps and stairs, balancing, and kneeling; mildly limited with understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple work-related decisions; moderately limited with understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions; no limitations with interacting appropriately with the public, supervisors, and/or coworkers; moderately limited with responding appropriately to usual work situations and to changes in a routine work setting; and moderately is defined as more than a slight limitation in this area but the individual is still able to function satisfactorily.

(AR 17). At Step Five of the SSI/DIB evaluation process, the ALJ found Salinas was able to perform other work in the national economy including the jobs of housekeeper cleaner and fast food worker. (AR 24–25). The ALJ therefore concluded Salinas was not disabled. (AR 25).

## III.    Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing she (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's residual functional capacity ("RFC") precludes her from performing her past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

Here, Salinas was denied at Step Five of the evaluation process. Step Five requires

the ALJ to consider whether, based on the claimant's RFC, the claimant can make an adjustment to a new kind of work. 20 C.F.R. § 416.920(a)(4)(v). If the ALJ determines the claimant can make an adjustment to other work, the disability claim is denied. *Id.* "While the claimant has the burden of proof at steps one through four, 'the burden of proof shifts to the [Commissioner]' at step five 'to show that the claimant can do other kinds of work.'" *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) (*quoting Embrey v. Brown*, 849 F.2d 418, 422 (9th Cir. 1988)).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotation marks and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v.*

*Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (*citing Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin*., 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion. *Id*. (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV.    Analysis

Salinas argues that the ALJ erred in weighing the medical opinions and in negatively assessing Salinas' credibility, and contends that these errors resulted in a RFC assessment that is not supported by substantial evidence. (Doc. 23 at 1–2). Salinas also argues that the ALJ erred in making her Step Five determination that Salinas could perform other working existing in the national economy because the ALJ relied on the VE's responses to the third hypothetical, which Salinas contends is inaccurate and not supported by the medical record. *Id*. at 24–25. Salinas argues that in light of Dr. King's opinion and the VE's responses to the second hypothetical, this matter should be remanded for an award of benefits. *Id*. at 26. Alternatively, Salinas requests that this matter be remanded for further administrative proceedings to give proper context to Dr. Ostrowski's opinion and to provide the VE "a hypothetical that includes all the material and relevant mental and physical impairments that Salinas suffers from." *Id*.

The Commissioner argues that the ALJ reasonably discredited Salinas' subjective complaints and properly evaluated the medical opinions to include all credible limitations in the RFC finding. (Doc. 25 at 6, 11). The Commissioner further contends that the ALJ's Step Five determination that Salinas could perform other work was supported by substantial evidence and that the ALJ properly relied on the VE's testimony. *Id.* at 20–21. The Commissioner states that Salinas has failed to demonstrate harmful error requiring remand for an award of benefits, and requests that if the Court does find error, that this matter be remanded for further administrative proceedings. *Id.* at 22–23.

The Court concludes that the ALJ erred in negatively assessing Salinas' credibility based on his activities of daily living, and that she gave improper consideration to Salinas' lack of treatment. These errors impacted the ALJ's RFC assessment and the hypotheticals posed to the VE. Consequently, these errors were not harmless because they ultimately impacted the Step Five nondisability finding, and the Court finds remand is appropriate.

### A.  RFC Assessment

Residual functional capacity is "the most [a claimant] can still do despite [his] limitations," and includes assessment of the claimant's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [he] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). In determining the RFC, if the ALJ finds a claimant cannot do his past work, the ALJ may still find that a claimant can adjust to other work if he can do any jobs that "exist in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(1).

The Commissioner retains the ultimate responsibility for assessing a claimant's RFC. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The ALJ was required to assess Salinas' RFC based on all the record evidence, including medical sources, examinations, and information provided by Salinas. 20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3). However, the ALJ need not include all possible limitations in her assessment of what a claimant can do, but rather is only required to ensure that the residual functional capacity

"contain[s] all the limitations that the ALJ found credible and supported by the substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

Here, Salinas challenges the ALJ's RFC assessment based on the weighing of the medical opinions and the finding that Salinas was not fully credible.

### i.    Credibility Finding

The ALJ found that Salinas' testimony regarding the intensity, persistence, and limiting effects of his symptoms was not fully credible based on his ability to participate in activities and because the medical evidence did not support the severity of the alleged allegations. (AR 18–19). Salinas argues that the ALJ failed to provide clear and convincing reasons for negatively assessing his credibility and that she gave improper weight to his activities of daily living and lack of medical treatment.  (Doc. 23 at 18–23).

"An ALJ's assessment of symptom severity and claimant credibility is entitled to great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015) (internal quotations and citations omitted). This is because "an ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v. Comm'r. Soc. Sec. Admin*., 775 F.3d 1090, 1106 (9th Cir. 2014) (citation omitted). "If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal quotations and citation omitted).

While questions of credibility are functions solely for the ALJ, this Court "cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Comm'r Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006). "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be

expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (*quoting Bunnell v. Sullivan*, 947 F. 2d 341, 344 (9th Cir. 1991)). "Second, if the claimant meets this first test and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (*quoting Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Further, "[t]he ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

While it is permissible for an ALJ to look to the objective medical evidence as one factor in determining credibility, the ALJ's adverse credibility finding must be supported by other permissible evidence in the record. *Bunnell*, 947 F.2d at 346-47 ("adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence"). However, "an ALJ may reject a claimant's statements about the severity of his symptoms and how they affect him if those statements are inconsistent with or contradicted by the objective medical evidence." *Robbins*, 466 F.3d at 887 (emphasis in original).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks and citations omitted).

Here, the ALJ did not make a finding that Salinas was malingering; therefore, to support her discounting of Salinas' assertions regarding the severity of his symptoms, the ALJ had to provide clear and convincing, specific reasons.

a.   Activities of Daily Living

The ALJ's credibility finding was based in part on her determination that "[d]espite his alleged limitations, the claimant has engaged in a somewhat normal level of

daily activity and social interaction." (AR 18). The ALJ stated that Salinas'

> activities of daily living included eating, watching television, and getting ready for bed. He stated he did not do any heavy lifting, but provided no limitations with regard to light lifting. This is inconsistent with his previous allegations of not being able to lift and/or carry. He alleged he could not tie his shoes or put on clothing with buttons. Otherwise, he acknowledged the ability to perform all other personal care activities with some difficulty bathing and caring for hair. He stated he went outside four times a week, he could go out alone, and he could drive very little only if necessary. He acknowledged he occasionally spent time with family, fiancé, brother-in-law, and visitors.

*Id*. The ALJ further noted that "some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." *Id*.

However, the ALJ's summation of Salinas' activities of daily living ignores Salinas' own testimony regarding these activities. In contrast to the ALJ's finding that Salinas could perform all personal care activities, Salinas stated that he had trouble performing his everyday functions (AR 200), and that he could not tie his shoes, put on clothes, or button, had less desire to bathe because he was not very stable, and that washing his hair was difficult (AR 210). Salinas also reported that he needed help with bathing and dressing and that he needed to sit down to put on his shoes and only wore slip on shoes. (AR 226). Similarly, while the ALJ found Salinas could watch TV, go out alone, and spend time with family and visitors, Salinas testified that he had no activities (AR 190, 213), that he watched TV every day and that it used to be enjoyable but was now painful and depressing (AR 212), and that he was homebound and that needed someone to accompany him places (AR 212). The ALJ also noted that one of Salinas' daily activities was eating, but Salinas testified that he could not cook, do the grocery shopping, or do the dishes (AR 46, 190), and that he never prepared his own meals (210). Salinas also consistently testified that he could not do any household chores or yardwork (AR 46, 190, 211), that he relied on his fiancé to care for him and their home (AR 189, 203), and that he had difficulty sleeping due to pain (AR 44, 189, 191, 200).

- 34 -

"[D]aily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (*quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "The ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (*quoting Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain and other symptoms because impairments that would unquestionably preclude work will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). "'[M]any home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication.'" *Id.* (*quoting Fair*, 885 F.2d at 603).

> "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."

*Id.* (*quoting Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

"Here, there is neither evidence to support that [Salinas'] activities were 'transferrable' to a work setting nor proof that [Salinas] spent a 'substantial' part of his day engaged in transferrable skills." *Orn*, 495 F.3d at 639. Salinas' daily activities of eating meals, watching TV, and getting ready for bed "are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace," especially when taking into consideration Salinas' statements that he is unable to walk, stand, or sit for any long period of time without being in severe pain (AR 200) and that he is always in pain (AR 43, 44, 47, 191, 208, 213). *Id.*; *see also Garrison*, 759 F.3d at 1016

1   (claimant's "daily activities, as she described them in her testimony, were consistent with
2   her statements about the impairments caused by her pain … [and are] also consistent with
3   an inability to function in a workplace environment."). Further, "[t]he record does not
4   suggest that Plaintiff at any time reported that [he] performed activities which would
5   translate to sustained activity in a work setting on a regular and continuing basis for eight
6   hours a day, five days a week." *Benjamin v. Colvin*, 2014 WL 4437288, at *4 (C.D. Cal.
7   Sept. 9, 2014).

8       A claimant "does not need to be 'utterly incapacitated' in order to be disabled."
9   *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair*, 885 F.2d at 603).
10  Here, it is clear from Salinas' testimony that his daily activities were extremely limited
11  due to his pain, and the ALJ's own notation that Salinas' activities included "eating,
12  watching television, and getting ready for bed" does not support her conclusion that
13  Salinas had a "somewhat normal level of daily activity and social interaction" or that "the
14  abilities and social interactions required in order to perform these activities are the same
15  as those necessary for obtaining and maintaining employment." (AR 18); *see Garrison*,
16  759 F.3d at 1016 (*quoting Reddick v. Chater*, 157 F.3d at 722) ("Recognizing that
17  'disability claimants should not be penalized for attempting to lead normal lives in the
18  face of their limitations,' we have held that '[o]nly if [her] level of activity were
19  inconsistent with [a claimant's] claimed limitations would these activities have any
20  bearing on [her] credibility.'").

21      Accordingly, the Court finds that the ALJ erred in finding that Salinas' activities
22  of daily living were inconsistent with his testimony regarding his pain-related
23  impairments. Further, this error was not harmless. Had the ALJ credited Salinas'
24  testimony regarding his pain and limited daily activities, including Salinas's testimony
25  that he has pain "24/7," can perform no household or yardwork tasks, and must
26  frequently change positions from sitting to standing to take pressure off his back, it would
27  have likely impacted the ALJ's assessment of the medical evidence, the RFC finding, and
28  the hypothetical posed to the VE. Thus, this error was harmful because it affected the

ultimate nondisability determination. *See Molina*, 674 F.3d at 1115.

b.   Lack of Treatment

The ALJ's finding that Salinas was not entirely credible regarding his pain and limitations was also based in part on her determination that the medical record did not support Salinas' allegations. (AR 18). The ALJ noted that Salinas "was documented as receiving routine and conservative treatment for back pain, numbness, and spasms" and that Salinas' diagnostic images did not support the severity of his allegations. (AR 19). However, the CT and MRI scans did reveal some abnormalities (AR 402, 405), and "[t]he amount of pain caused by a given physical impairment can vary greatly from individual to individual." *Fair*, 885. F.2d at 601.

The ALJ also noted that Salinas testified that he was not receiving PT at the time of the hearing, that he admitted he was feeling better with pain medication, that he was not taking any pain or depression medication at the time of the CEs in November 2012 and that he was not as bad now as he was in November 2012 because he was now on pain medication, and that he was not taking mental health medications or receiving psychiatric treatment. (AR 18). The ALJ further found that Salinas failed to follow treatment recommendations, noting that Salinas was discharged from PT for failing to return/complete the program and did not comply with the attendance policy by failing to show or cancelling three or more consecutive appointments, and that Salinas was documented as refusing to go to PT in a treatment note dated April 24, 2013. (AR 20). Regarding Salinas' mental impairments, the ALJ found that Salinas' allegation that he could not afford treatment was "inconsistent with the fact that he did receive some treatment, including prescriptions for medication, after the alleged onset date." (AR 22). The ALJ also noted that "there is no evidence the claimant sought low cost or no cost mental health care." The ALJ concluded that Salinas' "failure to seek consistent mental health treatment and take mental health medications as prescribed" and his refusal to attend PT "demonstrates a possible unwillingness to do what is necessary to improve his condition" and "may also be an indication that his symptoms were not as severe as he

purported." (AR 20, 22).

"[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). However, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Id*. (*quoting Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). While Social Security regulations require claimants to follow "treatment prescribed by [a] physician" to receive benefits, the same regulations make clear that if the claimant has "a good reason" for not following the prescribed treatment, rejection of treatment will not be held against the claimant. 20 C.F.R. § 416.930(a) & (b); SSR 96–7p. The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay . . ." *Orn*, 495 F.3d at 638 (*quoting* SSR 96–7p at 7–8).

Here, the ALJ's decision seems to ignore the fact that Salinas has been without medical insurance for a number of years. Salinas repeatedly noted that he could not afford medical treatment or medications due to his lack of insurance and limited funds. (AR 48, 201, 208). Dr. Milazzo prescribed several medications for Salinas that he could not fill because he was unable to afford them, and while Dr. Bamford recommended facet block injections, there is no record of Salinas being seen at the pain clinic. As to Salinas' alleged refusal to attend PT, the discharge summary notes that Salinas was seen for 8 visits for back pain, and that Salinas was to call after his last doctor's appointment if further PT was needed. (AR 495). Salinas did not call and was administratively discharged from PT. The discharge occurred shortly after Salinas saw Dr. Ostrowski, who stated that he would not recommend any further treatment with PT and opined that Salinas did not need additional treatment and could return to work full time. (AR 574–

75). Thus, Salinas explained his failure to pursue regular treatment based on lack of funds, and the fact that he was not regularly going to the doctor, attending PT, or taking mental health medications is not a clear and convincing reason for discrediting his symptom testimony. The ALJ did not suggest Salinas' proffered reason for not seeking treatment was "not believable," and the Court finds that "[Salinas'] failure to receive medical treatment during the period that he had no medical insurance cannot support an adverse credibility finding." *Orn*, 495 F.3d at 638; *see also Smolen*, 80 F.3d at 1284 ("Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so.").

Accordingly, the Court finds the ALJ erred in improperly relying on Salinas' lack of medical treatment as a reason to discount his credibility. Further, this error was not harmless. Had the ALJ properly considered Salinas' lack of medical insurance as a reason for his "routine and conservative treatment," the ALJ could not have relied on this lack of treatment to justify her adverse credibility finding, which in turn affected the ALJ's RFC assessment and the hypotheticals posed to the VE. Thus, this error was harmful because it affected the ultimate nondisability determination. *See Molina*, 674 F.3d at 1115.

ii.   Medical Testimony

Salinas alleges that the ALJ's medical opinion weight findings are not supported by clear and convincing reasons and are inconsistent with the law and evidence. Salinas specifically objects to the ALJ's assessment of the opinions of Dr. Ostrowski, Dr. Hassman, and Dr. King.

The Ninth Circuit distinguishes between treating, examining, and nonexamining physicians, and as a general rule, more weight is usually accorded to the treating physician's opinion. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). The ALJ may reject a treating or examining physician's uncontradicted opinion only if he gives clear and convincing reasons for doing so. *Id.* at 830-31; *see also Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989). If the treating or examining physician's opinion is contradicted by another doctor, the ALJ may reject that opinion only if he provides

specific and legitimate reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830-31. Further, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

a.   Dr. Ostrowski

Dr. Ostrowski performed an independent medical examination of Salinas for his worker's compensation claim, and concluded that Salinas could return to work at regular duty with no temporary or permanent work restrictions. In her decision, the ALJ first stated that she gave Dr. Ostrowski's opinion "significant weight," and then later stated that she gave the opinion "some weight." While it is thus unclear how much weight the ALJ actually assigned to Dr. Ostrowski's opinion, the Court finds that Salinas has failed to show how any alleged error by the ALJ in evaluating Dr. Ostrowski's opinion was harmful because the ALJ actually assessed more limitations in her RFC finding than what Dr. Ostrowski recommended. For example, while Dr. Ostrowski found that Salinas had no limitations and could return to his previous work as a prep cook full-time at regular duty, the ALJ found that Salinas was limited to light work, which precluded his past work as both a prep cook and a quality control technician.

Salinas also contends that the ALJ erred in misconstruing the meaning of "independent medical examiner" because Dr. Ostrowski was hired by the insurance company to conduct an examination for Salinas' worker's compensation claim, and thus was not actually independent. However, as noted above, even if Dr. Ostrowski's opinion cannot be considered to be truly independent, Salinas has failed to show harmful error on this issue because the ALJ actually assessed more limitations than Dr. Ostrowski recommended in his opinion.

Accordingly, the Court finds that the ALJ did not err in her assessment of Dr. Ostrowski's opinion, and that if any error did occur, the error was harmless because it did not affect the ultimate nondisability determination. *See Molina*, 674 F.3d at 1115.

b.    Dr. Hassman

Dr. Hassman performed a physical medicine CE of Salinas. The ALJ gave little weight to Dr. Hassman's opinion because it did "not adequately take into consideration all of the claimant's subjective and objective symptoms, signs, limitations, and severity of condition" and because Dr. Hassman did not "have access to the claimant's entire medical record and testimony." (AR 22). The ALJ also noted that Salinas testified that he was not taking any pain medication at the time of his appointment with Dr. Hassman and that his condition was improved with medication.

During the examination, Dr. Hassman noted that Salinas had a very abnormal gait, took tiny steps, and was very stiff. (AR 527). Salinas said he could not stand or walk on his toes or heels, could not hop, could not bend, could not kneel, and could not sit down because of pain. Dr. Hassman observed that Salinas "seemed to have an unusual response to anything I asked him to do. He sort of smiled to himself and looked around, as if he were confused and distracted, and just could not perform anything" and that when she asked him to perform cervical flexion, "[h]e obviously heard me but he did not move his head. Instead, he moved his eyes in all directions." (AR 527). Dr. Hassman opined that Salinas could occasionally and frequently lift and carry less than 10 pounds, stand and walk at least 2 hours but less than 6 hours in an 8 hour workday, and sit for 3 hours. (AR 528–29). She further opined that Salinas could occasionally stoop and reach, and that he could never kneel, crouch, crawl, or climb ramps, stairs, scaffolds, or ladders. (AR 530).

Dr. Hassman's opinion was contradicted by Dr. Ostrowski's opinion, thus the ALJ was required to give specific and legitimate reasons for assigning Dr. Hassman's opinion little weight. The Court finds that the ALJ has met this burden. First, the ALJ noted that Dr. Hassman's opinion did not adequately take into consideration all of Salinas' subjective and objective symptoms and the severity of his condition. As noted above,

during the exam Salinas refused to perform many of the tests, and had an "unusual response" to anything that Dr. Hassman asked him to do. The ALJ is not required to accept an opinion that is inadequately supported by clinical findings, thus the ALJ could properly discount Dr. Hassman's opinion where the limitations Dr. Hassman assessed were not based on objective findings because Salinas refused to perform the tests. *See Bayliss*, 427 F.3d at 1216; *see also Bullene v. Astrue*, 2012 WL 6917774, *7 (W.D. Wash. 2012) ("[T]he ALJ was entitled to discount a medical opinion where the provider noted that the claimant did not put forth full effort on testing, because the opinion is based on invalid test results."). Second, the ALJ noted that Dr. Hassman did not have access to Salinas' entire medical record and testimony. At the hearing before the ALJ, Salinas testified that at that time of his appointment with Dr. Hassman, he had run out of medication and was not seeing a doctor, so it was a tough time for him. (AR 42–43). Salinas also agreed with the ALJ that he was "actually better than what [Dr. Hassman's] report would suggest" and that the examination was performed on a particularly bad day for him. (AR 43). This was a specific and legitimate reason for the ALJ to assign little weight to Dr. Hassman's opinion because the opinion was based on an incomplete and inaccurate understanding of Salinas' condition. *See Conlee v. Colvin*, 31 F. Supp. 3d 1165, 1172 (E.D. Wash. 2014); *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012).

Salinas also argues that the ALJ erred in failing to include Dr. Hassman's lift/carry, sit/stand/walk, and stooping limitations in the hypothetical to the VE.[8] However, the ALJ is only required to include restrictions in a hypothetical that are supported by substantial evidence. *See Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006). Here, the ALJ assigned little weight to Dr. Hassman's opinion, and gave specific and legitimate reasons for the weight finding. Because the ALJ properly assigned little weight to the opinion, the ALJ was not required to include all of Dr. Hassman's limitations in the hypothetical to the VE, particularly where those limitations were not

---

[8] The ALJ did include Dr. Hassman's restriction of occasional stooping, but did not assess the same lifting/carrying and sitting/standing/walking limitations as Dr. Hassman recommended.

supported by objective findings on examination.

Accordingly, the Court finds that the ALJ did not err in assigning little weight to Dr. Hassman's opinion, and in not including all of the limitations assessed by Dr. Hassman in the hypothetical to the VE.

### c.    Dr. King

Dr. King performed a psychological CE of Salinas and opined that Salinas had moderate to marked limitations in sustained concentration and persistence "based on his reported level of chronic and persistent pain." (AR 538). Dr. King also found that "[b]ased on his reported presentation, he would have difficulty performing tasks within a normal work day due to significant interruptions and frequent rest periods." *Id.*

Dr. King's opinion was contradicted by Dr. Kerns' opinion, thus the ALJ was required to give specific and legitimate reasons for assigning Dr. King's opinion little weight. The ALJ noted that Dr. King documented Salinas as being able to cook simple meals[9] and described Salinas as demonstrating overall ability to maintain a household, and observed that Salinas presented with good interpersonal skills, reported no symptoms of psychosis, and demonstrated no significant problems with cognitive functioning. (AR 22–23). Thus, the ALJ pointed to specific findings in Dr. King's report that undermined Dr. King's opinion that Salinas had moderate to marked limitations, and this contradiction was a specific and legitimate reason to assign Dr. King's opinion little weight.

The ALJ also noted that "Dr. King stated that the claimant's reports contradicted information from Dr. Ostrowski . . . that the claimant was able to return to employment in February 2012." (AR 23). However, what Dr. King actually stated was that "Mr. Salinas reports contradictory information from an independent medical examiner that apparently alleged the claimant was about to return to employment." (AR 538). Dr. King did not make her own independent finding that Salinas' reports contradicted Dr. Ostrowksi's

---

[9] Salinas objects to this wording, but Dr. King did specifically note that Salinas could cook things in the microwave. (AR 535).

opinion. Thus, this is not a specific and legitimate reason to reject Dr. King's opinion. However, the Court must consider not just whether the ALJ erred, but whether the error was harmful. In this case, any error from the ALJ implying that Dr. King found a conflict between Salinas' subjective complaints and Dr. Ostrowski's opinion was harmless because the ALJ provided additional legitimate reasons for assigning Dr. King's opinion little weight. *See Burch*, 400 F.3d at 679. Because the ALJ gave at least one valid reason for assigning little weight to Dr. King's opinion, the ALJ's weight finding must be upheld. *See Batson*, 359 F.3d at 1198 (court must defer to ALJ's conclusion when evidence is subject to more than one rational interpretation).

### B.  *Step Five Finding*

Salinas objects to the ALJ's Step Five finding as "inconsistent with the evidence and the law." (Doc. 23 at 23). At "step five of the five-step sequential inquiry, the burden shifts to the Commissioner to prove that, based on the claimant's residual functional capacity, age, education, and past work experience, [he] can do other work." *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996). "If [he] can, [he] is not disabled; if [he] cannot, [he] is disabled." *Id.* "The Commissioner may carry this burden by 'eliciting the testimony of a vocational expert in response to a hypothetical that sets out all the limitations and restrictions of the claimant.'" *Conlee*, 31 F. Supp. 3d at 1173 (*quoting Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record." *Id.* (*citing Gamer v. Secretary of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir.1987) (hypothetical questions must "set out all of the claimant's impairments")). "'If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value.'" *Id.* (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)). "The ALJ, though, 'is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence.'" *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (*quoting Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001)).

Here, Salinas argues that the ALJ erred by relying on the VE's response to the third hypothetical and concluding that Salinas could work as a housekeeper cleaner or a fast food worker. The third hypothetical included mild limitations in understanding and remembering simple instructions, carrying out simple instructions, and ability to make judgments on simple work related decisions, and moderate limitations in ability to understand, remember, and carry out complex instructions, ability to make judgments on complex work related decisions, and ability to respond appropriately to usual work situations and change in a routine work setting. (AR 55). Salinas argues that the third hypothetical is inaccurate and unsupported by the medical record because no psychologist opined that Salinas had mild impairments in the areas noted in the hypothetical. Rather, Salinas contends that Dr. King found that he had moderate to marked limitations in the areas of sustaining concentration, persistence, and pace, which the VE testified would preclude all work (AR 57).

As discussed above, the Court finds that the ALJ did not err in assessing the medical opinions of Drs. Ostrowski, Hassman, and King; however, the Court does find that the ALJ erred in negatively assessing Salinas' credibility based on his activities of daily living and lack of medical treatment. This credibility finding impacted the ALJ's RFC determination, which in turn also impacted the ALJ's hypotheticals to the VE. While the ALJ was only required to include limitations in the hypothetical that the ALJ found to be credible and supported by substantial evidence in the record, in this case the ALJ's error in assessing Salinas' credibility casts doubt on the reliability of the VE's testimony at Step Five. Accordingly, the Court finds that remand is appropriate.

**V.    Remedy**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*,

574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir.1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke*, 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings.... Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995).

Here, the Court finds "[r]emand for further administrative proceedings is appropriate [because] enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. The ALJ erred in finding that Salinas' activities of daily living were inconsistent with his testimony regarding his pain-related impairments and in negatively assessing his credibility, as well as by giving improper consideration to Salinas' lack of treatment. Because of these errors, issues remain regarding Salinas' RFC and his ability to perform work existing in significant numbers in the national economy. This Court offers no opinion as to whether Salinas is disabled within the meaning of the Act.  However, the ALJ is required to consider all of Salinas' alleged impairments, whether severe or not, in her assessment on remand, and "[t]he RFC assessment must be based on *all* the relevant evidence in the case record." SSR 96–8p, 1996 WL 374184, at *5 (emphasis in original) ("The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient

1     evidence to assess RFC. Careful consideration must be given to any available information

2     about symptoms because subjective descriptions may indicate more severe limitations or

3     restrictions than can be shown by objective medical evidence alone."); C.F.R. §

4     416.920(e) (ALJ must consider claimant's subjective experiences of pain).

5     **VI.    Conclusion**

6        In light of the foregoing, the Court **REVERSES** the ALJ's decision and the case is

7     **REMANDED** for further proceedings consistent with this decision, including additional

8     hearing testimony, if necessary.

9        Accordingly, **IT IS HEREBY ORDERED** that the Commissioner's decision is

10    remanded back to an ALJ with instructions to issue a new decision regarding Salinas'

11    eligibility for disability insurance benefits. The ALJ will: (1) reassess Salinas' credibility

12    and activities of daily living; (2) give further consideration to all of the previously

13    submitted medical records, (3) further develop the record to fully and fairly assess

14    Salinas' conditions and limitations, as warranted, (4) further consider Salinas' residual

15    functional capacity, citing specific evidence in support of the assessed limitations, and (5)

16    continue the sequential evaluation process to assess whether in fact Salinas is disabled

17    within the meaning of the SSA and whether he is able to perform any work existing in the

18    national economy.

19        **IT IS FURTHER ORDERED** the Clerk of the Court shall enter judgment, and

20    close its file in this matter.

21        Dated this 8th day of March, 2016.

22

23

24

25    Eric J. Markovich
      United States Magistrate Judge

26

27

28